UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-mj-2719-JG

UNITED STATES OF AMERICA,

vs.

ANDREW ALTURO FAHIE and
OLEANVINE PICKERING MAYNARD,

    Defendants.
_____/

## UNITED STATES OF AMERICA'S MOTION FOR PRE-TRIAL DETENTION

During the spring of 2022, the Defendants conspired to import approximately 27,000 kilograms of cocaine into the United States, and to launder millions of dollars in drug proceeds from the United States to the British Virgin Islands ("BVI"). Throughout that time, Defendant Andrew Fahie was the Premier of the BVI, and Defendant Oleanvine Maynard was the Director of the BVI Ports Authority. Both Defendants accepted thousands of dollars in bribes to allow for the safe passage of cocaine through the BVI, and planned to receive millions more as part of their ongoing conspiracy.

In light of the Defendants' extensive criminal conduct, the danger they pose to the community, and their serious risk of flight, the United States hereby moves for the pre-trial detention of both Defendants under 18 U.S.C. § 3142(f)(1)(B)-(C). Due to the serious nature of the offenses committed by the Defendants, their detention is statutorily presumed under 18 U.S.C. § 3142(e)(3)(A).

1

I.      **Factual Background and Procedural History**[1]

Beginning in October 2021, a DEA confidential source ("CS") conducted several meetings with a group of self-proclaimed Lebanese Hezbollah operatives (the "Lebanese Group") who stated that they had business ties to South Florida and the Middle East. Those meetings occurred on the Island of Tortola in the BVI. The CS explained that he wanted to transport cocaine from Colombia, through Tortola, and into the United States. Members of that group agreed to assist the CS by facilitating introductions to senior members of the BVI government who could offer protection for the CS's activities, but would require payment for their assistance. This included Defendants Fahie and Maynard.

Between the months of March and April 2022, the CS met and communicated with Fahie, Oleanvine Maynard, and Kadeem Maynard on multiple occasions. During those meetings and calls, the CS informed the Defendants that he was a member of the Sinaloa Cartel, and he wished to transport thousands of kilograms of cocaine from Colombia, through Tortola, to Puerto Rico, with a destination of Miami and then New York. The Defendants agreed to help import cocaine into Puerto Rico and then Miami by: (1) providing businesses that the CS could use as cover for his operation; (2) providing the CS with the licenses needed to assure safe passage for his cocaine through the BVI; (3) accepting bribes to assure that the CS's shipments would not be stopped by law enforcement in the BVI ($10,000 to Maynard, and $20,000 to Fahie); (4) agreeing to accept future bribes to ensure the continued success of their drug trafficking venture; (5) arranging bribes to another BVI government official ("Government Official 1"), so that he/she would not interfere

---

[1] The facts set forth in this section are based on the complaint affidavit (DE 1), and additional facts gathered during the course of the investigation. The facts previously detailed in the complaint are not re-written here in detail, but are instead incorporated by reference. This section merely summarizes the offense conduct set out in the complaint, and adds additional factual details relevant to detention.

with their drug trafficking activity; (6) securing access for the CS through the BVI's ports and airports; (7) arranging to receive payments from the CS, through bank accounts, businesses, or cash deliveries via plane and boat; and (8) arranging for fake seizures of "bad" cocaine by the government of the BVI, to ensure that their real cocaine shipments would not attract attention.

The Defendants ultimately agreed that the first shipment of cocaine, 3,000 kilograms, would come through the BVI during early July 2022. Then, they would coordinate two shipments of 3,000 kilograms of cocaine every month, for a period of four months. As an initial payment for their role in the conspiracy, Fahie and Maynard planned to accept $700,000 in cash during a trip to Miami on April 28, 2022. That payment included $500,000 for Fahie, and $200,000 for Maynard. They would later be paid approximately 10% of the drug sales in Miami for each shipment, or roughly $7.8 million per load. In addition, they would receive 2% in order to pay for expenses on the island, including additional bribes. The Defendants agreed to this payment structure.

As noted in the Complaint, during the April 7, 2022 meeting, Fahie asked the CS if he could help Fahie pay $83,000 in cash to someone in Senegal. Fahie explained that this was someone he trusted, who he had known for 20 years, and who was "like a brother" to Fahie. The CS agreed to join Fahie and that man in St. Martin around May 3, 2022, so that the CS could provide that cash on Fahie's behalf. During their discussion about the man from Senegal, the CS asked if he could get them guns. Fahie responded, "I would have to ask him."

The CS met with Defendant Fahie again on the evening of April 27, 2022. A DEA undercover officer ("UC") was also present at that meeting, and the meeting was audio recorded. During the meeting, Fahie again discussed the man from Senegal to whom he owed money (in cash). Fahie explained that that person "did a few things for me, politically," and that he "knows

a lot about elections, so he'll come around elections." Later in their conversation, the CS and Fahie discussed what companies they would use to get money back to the BVI. Fahie explained that he had a woman who would arrange the companies for them, and that she did "a lot of things for me in politics, that's not above board, but she knows a lot, but she doesn't look it." The parties also discussed Government Official 1, and whether Government Official 1 would pose a problem for their plan. Fahie said "I'm going to fix [him/her]." The CS responded "you will pay [her/him]?" Fahie confirmed, "yea, I will fix [him/her]."

Later during that same meeting, the parties discussed how Fahie would handle the cash that would be brought to the BVI as payment for his role in the conspiracy. The UC showed Fahie a picture of the cash that was packaged to travel back to the BVI on a private jet the following day. The parties also discussed how the money could be sent back to the BVI on an ongoing basis, as their plan progressed. Fahie mentioned using a line of credit to disguise their transactions, or using construction activity that he was involved in, which included the purchase and/or sale of windows, doors, tiles, etc. The CS and Fahie then discussed doing cash deliveries via boat to the BVI. Fahie explained: "I'm gonna get everything rolling, so we can get that money . . . the first payment by boat . . . once you bring that down I'll tell you exactly where, I have a guy, reliable, like my brother, but he does a lot of business on the 'other side.'" The CS asked, "what is the business on the other side?" Fahie responded, "well, he does, he ships, he moves anything that he's moving now, whether it's cocaine, or whether it's guns, he does everything . . . he's reliable." Fahie then provided that person's nickname, and he/she is a well-known drug trafficker in the BVI who has prior convictions for firearms possession and possessing with intent to distribute narcotics.

After discussing the use of Fahie's "reliable" criminal associate, the CS cautioned Fahie not to discuss their business via the phone. Fahie responded by assuring the CS that he was very

4

careful in his business. He told the CS that when people provided him with large amounts of cash, and that cash came wrapped in bank wrappers, he would always remove, tear up, and discard the wrappers because the banks could trace the currency based on the stamps or codes on the wrappers. Impressed by Fahie's criminal acumen, the CS asked, "so this is not your first rodeo right, I can tell . . ." Fahie responded:

"Oh no no no, not my first rodeo at all, NOT, MY FIRST RODEO, AT ALL."

Fahie then laughed, and went on to describe his prior criminal activity. He told a story about saving a man $3 million dollars, and how that man agreed to pay Fahie $1 million dollars for Fahie's efforts. However, that individual also arranged for the courier providing the $1 million to be robbed before the cash was provided to Fahie. Fahie further explained that, over the last 15-20 years, he had lost out on about 7.5 million dollars he was owed where the "deal" went through (the drug deal), but he was stiffed and not paid by his criminal partner.

The following day, Fahie and the CS travelled to Opa Locka airport. Upon arrival, the CS offered to allow Fahie to view the cash that would be flown back to the BVI on Fahie's behalf. Fahie boarded the private jet and was shown the $700,000 in cash that was intended for him and Maynard.[2] Fahie inquired as to how the money would be hidden in a suitcase, and the CS described the process. Fahie then asked, so "this is the full seven?" The CS responded "yes, 700." Fahie later exited the plane and was arrested. That same morning, Maynard went through a similar visit to the airport, and reviewed the cash in anticipation of flying it back to the BVI. She was subsequently arrested.

---

[2] This cash was "sham," or fake, currency.

Following their arrests, Fahie and Maynard were charged by criminal complaint with: (1) conspiracy to import five kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 963, 952, and 960(b)(1)(A); and (2) conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(c)(7)(A), and 1956(c)(7)(B)(iv); all in violation of 18 U.S.C. § 1956(h). If convicted on the drug trafficking conspiracy, the Defendants would face a ten-year mandatory minimum sentence, and an estimated sentencing guidelines range of 235-293 months. If convicted on the money laundering conspiracy, the Defendants face an estimated guidelines range of either 292-365 months, or 360 months to life, depending on the applicability of certain sentencing enhancements.

## II.     Personal Characteristics[3]

### a.     Defendant Andrew Fahie

According to the Pretrial Services Report, Defendant Fahie has resided on the Island of Tortola for thirty one years, and is not an United States citizen. The majority of his work and family ties are to the BVI. He has extensive foreign travel within the last ten years, including to the U.S. Virgin Islands, England, Puerto Rico, Saint Maarten, St. Kitts, and Antigua. According to the U.S. Customs and Border Protection encounter list for Fahie, he has 396 "encounters" between 1992 and 2022. Those encounters generally refer to international travel by Fahie, and included travel by commercial aviation, cruise ship, pedestrian crossing, and pleasure boat. Fahie also discussed past travel to China with the CS during the course of this investigation. With regard to his finances, Defendant Fahie has at least seven different bank accounts, including one holding approximately $95,000. In addition, the Defendant owns several properties or buildings, with a

---

[3] The Personal Characteristics section is based on information contained in the pre-trial services report, and gathered through the course of the investigation into the Defendants.

total value of approximately $2.4 million.  Fahie's limited contacts in the Southern District of Florida come via his daughters who have or will attend college here, and have a college apartment near Florida International University ("FIU").

      **b.**     **Defendant Oleanvine Maynard**

According to the Pre-Trial Services Report, Defendant Maynard was born on Tortola, BVI, and has resided in the BVI, the U.S. Virgin Islands, and the United States.  She has no current family or contacts in the Miami area, she does not have employment in the Miami area, and she does not have a residence in the Miami area.  The Defendant is employed in the BVI, and owns a company in the BVI.  According to the U.S. Customs and Border Protection encounter list for Maynard, she has 295 "encounters" between 1998 and 2022.  Those encounters generally refer to international travel by Maynard, and included travel by commercial aviation, cruise ship, pedestrian crossing, and pleasure boat.  With regard to her finances, the Defendant has around $46,000 in various bank accounts, and owns a residence worth $1.5 million.

**III.**    **Legal Standard**

Under the Bail Reform Act, Title 18, United States Code, Section 3141, *et seq.*, federal courts are empowered to order a defendant's detention pending trial if the court determines that the defendant is either a danger to the community or a risk of flight.  *See* 18 U.S.C. § 3142(e).  In cases where there is probable cause to believe that the defendants committed certain offenses under the Controlled Substances Import and Export Act (21 U.S.C. § 951, *et seq*.), like the Defendants here, the Court is required to "presume[] that  no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3).  Should the Defendants rebut that presumption, the Court is still required to analyze the facts presented to determine whether the Defendants are a risk of flight, or danger to

the community. A finding that a defendant represents a danger to the community must be supported by clear and convincing evidence, while a finding of risk of flight need only be supported by a preponderance of the evidence. *See* 18 U.S.C. § 3142(f); *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990); *United States v. King*, 849 F.2d 485, 489 (11th Cir. 1988).

In determining whether detention pending trial is appropriate, the Court must consider the following factors: (1) the nature and circumstances of the offense charged, including whether the offense involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

**IV.    Both Defendants Should be Ordered Detained Pending Trial**

As an initial matter, both Defendants should be detained based on the statutory presumption that they post a risk of flight and a danger to the community based on the offense that they committed. 18 U.S.C. § 3142(e)(3). Because there is probable cause that the Defendants committed a violation of the Controlled Substances Import and Export Act, and that offense carries a maximum term of ten years or more, detention is presumed in this matter. Should the Defendants overcome that presumption, and they cannot, detention is still required because both Defendants pose a danger to the community, and a serious risk of flight.

    **a.    Defendant Fahie is a Danger to the Community**

Through the course of this conspiracy, it has become clear that Fahie is engaged in corruption and criminal activity at the highest levels. He has accepted bribes, he has agreed to pay bribes, he has conspired to import thousands of kilograms of a dangerous controlled substance, he has admitted to working with known drug dealers in the BVI, and he has expressed a willingness

to inquire about the acquisition of firearms from a Senegalese contact – on behalf of the Sinaloa Cartel.  Fahie added that his "reliable" criminal associate in the BVI was involved in moving both money and guns (apparently with the knowledge and acquiescence of Fahie).  According to Fahie himself, he has been involved in this type of criminal activity for 15-20 years.  His release would result in a danger to the community by allowing for continued drug trafficking from the BVI to the United States, and the ongoing protection of criminal activity provided by Fahie.  Not only would Fahie himself serve as a danger to the community, but his freedom in society would allow for the unfettered criminal activity of Fahie's associates to continue.

   b.  **Defendant Fahie is a Serious Risk of Flight**

  Perhaps more concerning than the danger posed by Fahie is the severe risk that he will flee from prosecution if released on bond.  Fahie presents a particularly concerning risk of flight because he has a compelling reason to flee, he has a demonstrated disregard for the rule of law, he has the connections and ability to flee, and he has extremely limited connections to the Southern District of Florida.  As an initial matter, Fahie is facing a very high guidelines sentence after conviction, along with whatever political consequences he may face.  At the very low end, the Defendant is facing a sentence of 235 months, or approximately 20 years.  His eventual sentence provides a clear and compelling reason to flee from prosecution if released on bond.  Not only that, but the Defendant has repeatedly shown a complete and utter disregard for the rule of law, along with a willingness to obstruct justice.  Instead of fulfilling his oath of office, and carrying out his duties as required, Fahie did the exact opposite.  He accepted bribes, committed crimes, worked with drug dealers, and agreed to pay bribes.  He was approached by a purported member of the Sinaloa Cartel with a lucrative criminal opportunity, and instead of turning the cartel in, he joined them. Through this investigation, it has become clear that Fahie is corrupt to the core.  His actions

lead to only one conclusion: that Fahie believes he is above the law. And that's not just in this case, but – according to Fahie – for the past 15-20 years. This was not his "first rodeo," no no no, "NOT AT ALL."

In addition to the severe consequences Fahie is facing, and his total disregard for the rule of law, the Defendant has the connections and ability to flee in order to avoid prosecution. He has contacts in Senegal who did political work for him. He worked with a "reliable" BVI drug trafficker involved in moving cocaine and guns through the Caribbean by boat. He had a female "fixer" in the BVI who did a lot of "things" for him in politics that were not "above board." He controlled access to the ports and airports of the BVI, and discussed travel via boats and private aircraft. He has an extensive history of foreign travel, very limited ties to the Southern District of Florida, and the funds required to finance a life on the run. His sole connection to the Southern District of Florida is the fact that one of his daughters will soon graduate from FIU, and another will soon enroll there. He is essentially relying on their college apartment to establish ties to Miami.

In addition to the foregoing, the evidence against the Defendant is overwhelming. 18 U.S.C. § 3142(g)(2). He and his co-conspirators were captured on multiple audio and/or video recorded meetings or calls. He repeatedly expressed his interested in pursuing this criminal conspiracy, despite being given multiple opportunities to withdraw. He explained that he had a history of criminal activity, and had done this type of thing before. The evidence of the Fahie's guilt is substantial and undisputable.

Finally, the Defendant is subject to potential immigration consequences in connection with the crimes he has committed. The Defendant travelled to the United States under a Visa Waiver, and has failed to comply with the terms of that status by committing the crimes detailed herein.

This potentially subjects the Defendant to removal from the United States. If removed to the BVI, the Defendant would be nearly unreachable by the United States due to the lengthy extradition process between the United States and the BVI.

Given the sentence the Defendant is facing, his clear contempt for the rule of law, his criminal contacts, and his ability to travel internationally, the only possible conclusion is that he Defendant poses a severe risk of flight. There are no bond terms or conditions that could assure his appearance before this Court. If bond is granted, it is a near certainty that the Defendant will never again be seen in the Southern District of Florida. He should therefore be ordered detained pending trial.

   c.   **Defendant Maynard is a Danger to the Community**

In addition to her conspiracy to import thousands of kilograms of cocaine into the United States with Fahie, Maynard helped her son Kadeem set up his own side deal for 60 kilograms a month. Kadeem explained that he had been involved in drug trafficking for a long time, and his mother Maynard observed and approved. She is responsible for conspiring to distribute thousands of kilograms of cocaine to the United States, and – through her son Kadeem – throughout the Caribbean. Further, she is an admitted associate of a group of criminals in the BVI who claim to be Hezbollah operatives involved in criminal activity on Tortola. Maynard's planned drug distribution, and the violence it would inevitably create, demonstrate why Maynard is such a danger to the community, and should be detained on that basis.

   d.   **Defendant Maynard is a Serious Risk of Flight**

Like Fahie, Maynard also poses a serious risk of flight if she is released. She faces the same serious consequences for her crime, both in terms of a likely sentence and political repercussions. Those consequences provide ample motive for Maynard to flee prosecution if

released on bond. Maynard has also shown a complete willingness to disregard the laws of her country, and of the United States. Instead of fulfilling her role as Director of Ports, and upholding the laws of her own country, Maynard sold out to the highest bidder. How can she be expected to comply with the orders of this Court when she has consistently disregarded her own legal responsibilities throughout the course of this investigation? Further, Maynard has the means and ability to successfully flee prosecution in the United States. She and her son discussed using charter boats to move drugs in the Caribbean, and she has no connection to the Miami area. Her CBP encounters also illustrate an ability and willingness to travel internationally. Like Fahie, the evidence against Maynard is overwhelming, including numerous recorded meetings. If released, the Defendant would almost certainly flee. She should be detained pending trial to prevent her flight.

IV. **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court order that the Defendants be detained pending trial.

                                        Respectfully submitted,

                                        JUAN ANTONIO GONZALEZ
                                        UNITED STATES ATTORNEY

By:   <u>/s/ Frederic C. Shadley</u>
       Frederic C. Shadley
       Assistant United States Attorney
       Court ID No. A5502298
       11200 NW 20th Street, Suite 101
       Miami, Florida 33172
       Tel: (305) 715-7649/ 7654
       Fax: (305) 715-7639
       Email: Frederic.Shadley@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 4, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                By:    <u>/s/ Frederic C. Shadley</u>
                          Frederic C. Shadley
                          Assistant United States Attorney