UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:22-mj-02719-JG

UNITED STATES OF AMERICA,

vs.

ANDREW ALTURO FAHIE, et al.,

    Defendants.

_____/

ANDREW A. FAHIE'S NOTICE OF
<u>FILING EXHIBITS</u>

    Defendant, The Honorable ANDREW A. FAHIE, ("**Hon. A. Fahie**")  Premier of the Virgin Islands, hereby notices his filing of exhibits offered in connection with his previously noticed invocation of Head of Government immunity.  The Hon. A. Fahie remains in the custody of the United States as of this writing.

    Exhibit A is a true and correct copy of a Diplomatic Note to the United States Office of International Affairs from the Office of the Premier of the Virgin Islands.

    Exhibit B is a true and correct copy of a Miami Protocol Request relating to the official travel of the Hon. A. Fahie to Miami sent April 23, 2022.

    Exhibit C if a true and correct copy of the judgment of the International Criminal Court, dated February 14, 2002 in the Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belguim).

Respectfully submitted,

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Counsel for Defendant Andrew A. Fahie*
200 East Broward Blvd., Suite 1110
Fort Lauderdale, FL  33301
Telephone: 954-453-8000
Telefax: 954-453-8010

By: /s/  Theresa M.B. Van Vliet
      Theresa M.B. Van Vliet, Esq.
      Florida Bar No.: 374040
      Email: tvanvliet@gjb-law.com

      Joyce A. Delgado, Esq.
      Florida Bar No.: 1002228
      Email: jdelgado@gjb-law.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the forgoing was filed/served on May 4, 2022 via the ECF filing system upon: Frederic C. Shadley, Assistant United States Attorney, 1120 N.W. 20th Street, Miami, FL 33172.

By: /s/  Theresa M.B. Van Vliet
Theresa M.B. Van Vliet, Esq.

# EXHIBIT "A"



**NOTE NO.: 07/22**

The Office of the Premier of the Virgin Islands presents its compliments to the United States Office of the International Affairs and has the honour to confirm that Honourable Andrew A. Fahie is currently the duly appointed constitutional Premier of the Virgin Islands. Enclosed please find supporting documentation.

The Office of the Premier of the Virgin Islands hereby further confirms that it is the official position of the Government of the Virgin Islands that the Honourable Andrew A. Fahie, as the most Senior Member of the Cabinet, holds high ranking office in the Virgin Islands and on that basis possess immunity as recognized by international and domestic law, akin to Heads of Government Immunity.

The Office of the Premier of the Virgin Islands hereby confirms that the Honourable Andrew A. Fahie, possessed such immunity at the time of his arrest by U.S. law enforcement in the Southern District of Florida on April 28, 2022, and that he continues to possess such immunity. We further confirm that the Honourable Andrew A. Fahie has not waived such immunity.

The Office of the Premier of the Virgin Islands hereby requests on behalf of the Government of the Virgin Islands the immediate and unconditional release of the Honourable Andrew A. Fahie from U.S. custody and his immediate return and free passage to the Virgin Islands.

The Office of the Premier of the Virgin Islands avails itself of this opportunity to renew to the United States Department of Justice the assurances of its highest consideration.

Office of the Premier
British Virgin Islands

MAY 0 3 2022

3rd May, 2022

Attachments (7 pages)

33 Admin Drive, Road Town, TORTOLA VG1110
British Virgin Islands

Tel: (284) 468- 2152 · Fax: (284) 468-2576 · Email: premier@gov.vg



THIS PAGE IS RESERVED FOR OFFICIAL OBSERVATIONS
CETTE PAGE EST RESERVEE AUX OBSERVATIONS OFFICIELLES (11)

*THERE ARE NO OFFICIAL OBSERVATIONS*

HOLDER'S SIGNATURE/SIGNATURE DU TITULAIRE

UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

P          GBR       560733817

FAHIE

ANDREW ALTURO

BRITISH CITIZEN

07 AUG /AOUT 70

M          BRITISH VIRGIN ISLANDS

21 MAY /MAI 19   HMPO

21 MAY /MAI 29

SEE PAGE ABOVE

P<GBRFAHIE<<ANDREW<ALTURO<<<<<<<<<<<<<<<<<<<<
5607338170GBR7008072M2905213<<<<<<<<<<<<<<00

**VIRGIN ISLANDS**



### INSTRUMENT APPOINTING THE HONOURABLE ANDREW A. FAHIE TO BE PREMIER

**BY HIS EXCELLENCY, AUGUSTUS J. U. JASPERT, GOVERNOR OF THE VIRGIN ISLANDS**

**(Sgd.) Augustus J. U. Jaspert,**
**Governor**

**TO:       THE HONOURABLE ANDREW A. FAHIE**

   **GREETINGS**:

   **WHEREAS** section 52 (1) (a) of the Virgin Islands Constitution Order, 2007 provides that where a political party gains a majority of the seats of elected members of the House of Assembly (hereinafter referred to as "the House") the Governor shall appoint as Premier the elected member of the House recommended by a majority of the elected members of the House who are members of that party;

   **WHEREAS** elections for the membership of the House were held on the 25th day of February, 2019 and the Virgin Islands Party gained a majority of the seats of elected members of the House;

   **AND WHEREAS** the Virgin Islands Party gained a majority of the seats of elected members of the House and the elected members of that party have recommended the appointment of **ANDREW A. FAHIE** as Premier;

   **NOW THEREFORE**, I, **AUGUSTUS J. U. JASPERT**, Governor of the Virgin Islands, acting in accordance with the provisions of section 52 (1) (a) of the Virgin Islands Constitution Order, 2007, DO by this instrument under the Public Seal appoint you, **ANDREW A. FAHIE** to be the Premier of the Virgin Islands.

                                             Given under my hand and the Public Seal of
                                             the Virgin Islands this 26th day of February,
                                             2019 and in the sixty-eighth year of Her
                                             Majesty's reign.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:22-mj-02719-JG

UNITED STATES OF AMERICA,

vs.

ANDREW ALTURO FAHIE, et al.,

Defendants.

_____/

## ANDREW A. FAHIE'S NOTICE OF
## INVOCATION OF IMMUNITY

Defendant, The Honorable ANDREW A. FAHIE, ("**Hon. A. Fahie**") Premier of the Virgin Islands, hereby notices his invocation of all rights of and to immunity under international and domestic law, as the duly elected and sitting head of government of the Virgin Islands, a British Overseas Territory, including but not limited to immunity from arrest and detention, entitling him to immediate and unconditional release from detention by the United States.

1. The Hon. Fahie was duly elected to the office of Premier of the Virgin Islands and has been in such office since February 26, 2019.

2. The United States Department of Justice concedes that the Hon. Fahie "**was, and is**" the Premier. [Doc. 1 at 3.] (emphasis added). As such, the Executive Branch of the United States Government has recognized the Hon. Fahie as the constitutional head of Government of the Virgin Islands.

3. The Hon. Fahie was arrested by law enforcement personnel of the United States government on or about April 28, 2022 and remains in custody as of this writing.

4. There has been no known express waiver of the Hon. Fahie's immunity conferred under international and domestic law.

Respectfully submitted,

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Counsel for Defendant Andrew A. Fahie*
200 East Broward Blvd., Suite 1110
Fort Lauderdale, FL 33301
Telephone: 954-453-8000
Telefax: 954-453-8010

By: /s/ Theresa M.B. Van Vliet
   Theresa M.B. Van Vliet, Esq.
   Florida Bar No.: 374040
   Email: tvanvliet@gjb-law.com

   Joyce A. Delgado, Esq.
   Florida Bar No.: 1002228
   Email: jdelgado@gjb-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was filed/served on May 2, 2022 via the ECF filing system upon: Frederic C. Shadley, Assistant United States Attorney, 1120 N.W. 20th Street, Miami, FL 33172.

By: /s/ Theresa M.B. Van Vliet
   Theresa M.B. Van Vliet, Esq.



**PRIME MINISTER**
**BARBADOS**

April 1, 2022

Dear Premier Fahie,

I wish to extend an invitation to you to attend a roundtable discussion on de-risking and correspondent banking in Bridgetown on Wednesday, April 20, 2022. The architect of this all-day event is Rep. Maxine Waters, Chairwoman of the House Financial Services Committee and it follows on a similar meeting held in the United States on November 19, 2019.

Chairwoman Waters will be accompanied by members of the Financial Services Committee and other members of the US House of Representatives. The event will be co-hosted by the Governments of Barbados and the USA and will be attended by senior representatives of several US and Canadian banks with which Caribbean countries have a relationship.

Also in attendance will be other CARICOM Heads of Government, the CARICOM and OECS Secretaries-General and the President of the Caribbean Development Bank.

This encounter will provide the ideal opportunity for us to engage with major players in the financial services industry in order to find solutions for these intractable issues.

Your presence will definitely be very instrumental and important in addressing the myriad of problems associated with these issues.

Hon. Andrew A. Fahie
Premier
British Virgin Islands

Page 2

April 1, 2022

Hon. Andrew A. Fahie

My Government will defray the costs of your accommodation during your stay. Please have your office contact Mr. John Blackman, Senior Foreign Service Officer at jblackman@foreign.gov.bb and copied to Barbados@foreign.gov.bb to indicate your participation.

I look forward to welcoming you to Barbados on April 20, 2022.

Yours sincerely,

**Mia Amor Mottley, Q.C., M.P.**

# EXHIBIT "B"



**OFFICE OF THE PREMIER**
GOVERNMENT OF THE
VIRGIN ISLANDS

#33 Admin Drive, Central Administration Complex
Road Town, Tortola, VG 1110, BRITISH VIRGIN ISLANDS
Tel. (284) 468-3701 ext. 2152   Fax. (284) 468-2576 Email: premier@gov.vg

| | |
|---|---|
| **TO:** | Mr. James Carlin<br>Director of International Affairs and Protocol Division<br>Miami International Airport |
| **FAX NO.:** | 1 305 869 4536          **NO. OF PAGES: 2**   (including cover) |
| **FROM:** | Ms. Najan Christopher<br>Director, International Affairs Secretariat |
| **DATE:** | Saturday 23rd April, 2022 |
| **SUBJECT:** | **Travel of the Premier of the British Virgin Islands,**<br>**Honourable Andrew A. Fahie, MHA** |

Dear Mr. Carlin,

I hereby request your kind assistance in providing protocol intervention for the Premier of the British Virgin Islands, the Honourable Andrew A. Fahie and Mrs. Fahie who will be traveling to Miami on official business on Sunday 24th April, 2022.

He is scheduled to depart Miami to Sint Maarten, on official business on Tuesday 3rd May, 2022. The Premier will be accompanied by his wife Mrs. Sheila Fahie.

Should you require any additional information, please contact Assistant Secretary for External Affairs, International Affairs Secretariat, Ms. Dwynel Davis by email at dwdavis@gov.vg or at 284-443-2014.

Thank you for your kind consideration.

..................................
Najan Christopher
Director



#33 Admin Drive, Central Administration Complex
Road Town, Tortola VG1110, BRITISH VIRGIN ISLANDS
Tel. (284) 468-3701 ext 2152  Fax. (284) 468-3294 Email: premier@gov.vg

## REQUEST FOR AIRPORT COURTESIES - TRAVEL NOTIFICATION

| | | | |
|---|---|---|---|
| **NAME OF DIGNITARY:** | Honourable Andrew A. Fahie | | |
| **OFFICIAL TITLE:** | Premier of the British Virgin Islands | **NATIONALITY:** | British |
| **PASSPORT:** | 560733817 | | |
| **ISSUE DATE:** | 21st May, 2019 | **EXPIRATION:** | 21st May, 2029 |
| **DATE OF BIRTH:** | 7th August, 1970 | **OFFICIAL TRAVEL:** | YES |

A.   ARRIVE MIAMI INTERNATIONAL FROM ST. THOMAS, USVI

**DATE OF ARRIVAL:**       Sunday 24th April, 2022
**TIME OF ARRIVAL:**       8:30 p.m.
**AIRLINE & FLIGHT:**      American Airlines AA 1168

### OVERNIGHT

B.   DEPART MIAMI INTERNATIONAL TO ST. MAARTEN, SINT MAARTEN

**DATE OF DEPARTURE:**     Tuesday 3rd May, 2022
**TIME OF DEPARTURE:**     10:00 a.m.
**AIRLINE & FLIGHT:**      American Airlines AA 1136

# EXHIBIT "C"

COUR INTERNATIONALE DE JUSTICE

RECUEIL DES ARRÊTS,
AVIS CONSULTATIFS ET ORDONNANCES

# AFFAIRE RELATIVE AU MANDAT D'ARRÊT DU 11 AVRIL 2000

(RÉPUBLIQUE DÉMOCRATIQUE DU CONGO c. BELGIQUE)

**ARRÊT DU 14 FÉVRIER 2002**

# 2002

INTERNATIONAL COURT OF JUSTICE

REPORTS OF JUDGMENTS,
ADVISORY OPINIONS AND ORDERS

# CASE CONCERNING THE ARREST WARRANT OF 11 APRIL 2000

(DEMOCRATIC REPUBLIC OF THE CONGO *v.* BELGIUM)

**JUDGMENT OF 14 FEBRUARY 2002**

Mode officiel de citation:

*Mandat d'arrêt du 11 avril 2000 (République démocratique
du Congo c. Belgique), arrêt,
C.I.J. Recueil 2002, p. 3*

———————

Official citation:

*Arrest Warrant of 11 April 2000 (Democratic Republic
of the Congo* v. *Belgium), Judgment,
I.C.J. Reports 2002, p. 3*

ISSN 0074-4441
ISBN 92-1-070940-3

Nº de vente:
Sales number

**837**

14 FÉVRIER 2002

ARRÊT

MANDAT D'ARRÊT DU 11 AVRIL 2000

(RÉPUBLIQUE DÉMOCRATIQUE DU CONGO c. BELGIQUE)

———————

ARREST WARRANT OF 11 APRIL 2000

(DEMOCRATIC REPUBLIC OF THE CONGO *v.* BELGIUM)

14 FEBRUARY 2002

JUDGMENT

3

INTERNATIONAL COURT OF JUSTICE

YEAR 2002

**14 February 2002**

2002
14 February
General List
No. 121

# CASE CONCERNING THE ARREST WARRANT OF 11 APRIL 2000

## (DEMOCRATIC REPUBLIC OF THE CONGO v. BELGIUM)

*Facts of the case — Issue by a Belgian investigating magistrate of "an international arrest warrant in absentia" against the incumbent Minister for Foreign Affairs of the Congo, alleging grave breaches of the Geneva Conventions of 1949 and of the Additional Protocols thereto and crimes against humanity — International circulation of arrest warrant through Interpol — Person concerned subsequently ceasing to hold office as Minister for Foreign Affairs.*

\*  \*

*First objection of Belgium — Jurisdiction of the Court — Statute of the Court, Article 36, paragraph 2 — Existence of a "legal dispute" between the Parties at the time of filing of the Application instituting proceedings — Events subsequent to the filing of the Application do not deprive the Court of jurisdiction.*

*Second objection of Belgium — Mootness — Fact that the person concerned had ceased to hold office as Minister for Foreign Affairs does not put an end to the dispute between the Parties and does not deprive the Application of its object.*

*Third objection of Belgium — Admissibility — Facts underlying the Application instituting proceedings not changed in a way that transformed the dispute originally brought before the Court into another which is different in character.*

*Fourth objection of Belgium — Admissibility — Congo not acting in the context of protection of one of its nationals — Inapplicability of rules relating to exhaustion of local remedies.*

*Subsidiary argument of Belgium — Non ultra petita rule — Claim in Application instituting proceedings that Belgium's claim to exercise a universal jurisdiction in issuing the arrest warrant is contrary to international law — Claim not made in final submissions of the Congo — Court unable to rule on that ques-*

4

*tion in the operative part of its Judgment but not prevented from dealing with certain aspects of the question in the reasoning of its Judgment.*

\* \*

*Immunity from criminal jurisdiction in other States and also inviolability of an incumbent Minister for Foreign Affairs — Vienna Convention on Diplomatic Relations of 18 April 1961, preamble, Article 32 — Vienna Convention on Consular Relations of 24 April 1963 — New York Convention on Special Missions of 8 December 1969, Article 21, paragraph 2 — Customary international law rules — Nature of the functions exercised by a Minister for Foreign Affairs — Functions such that, throughout the duration of his or her office, a Minister for Foreign Affairs when abroad enjoys full immunity from criminal jurisdiction and inviolability — No distinction in this context between acts performed in an "official" capacity and those claimed to have been performed in a "private capacity".*

*No exception to immunity from criminal jurisdiction and inviolability where an incumbent Minister for Foreign Affairs suspected of having committed war crimes or crimes against humanity — Distinction between jurisdiction of national courts and jurisdictional immunities — Distinction between immunity from jurisdiction and impunity.*

*Issuing of arrest warrant intended to enable the arrest on Belgian territory of an incumbent Minister for Foreign Affairs — Mere issuing of warrant a failure to respect the immunity and inviolability of Minister for Foreign Affairs — Purpose of the international circulation of the arrest warrant to establish a legal basis for the arrest of Minister for Foreign Affairs abroad and his subsequent extradition to Belgium — International circulation of the warrant a failure to respect the immunity and inviolability of Minister for Foreign Affairs.*

\* \*

*Remedies sought by the Congo — Finding by the Court of international responsibility of Belgium making good the moral injury complained of by the Congo — Belgium required by means of its own choosing to cancel the warrant in question and so inform the authorities to whom it was circulated.*

# JUDGMENT

*Present:* *President* GUILLAUME; *Vice-President* SHI. *Judges* ODA, RANJEVA, HERCZEGH, FLEISCHHAUER, KOROMA, VERESHCHETIN, HIGGINS, PARRA-ARANGUREN, KOOIJMANS, REZEK, AL-KHASAWNEH, BUERGENTHAL; *Judges* ad hoc BULA-BULA, VAN DEN WYNGAERT; *Registrar* COUVREUR.

In the case concerning the arrest warrant of 11 April 2000,

*between*

the Democratic Republic of the Congo,

represented by

> H.E. Mr. Jacques Masangu-a-Mwanza, Ambassador Extraordinary and Plenipotentiary of the Democratic Republic of the Congo to the Kingdom of the Netherlands,
>
> as Agent;
>
> H.E. Mr. Ngele Masudi, Minister of Justice and Keeper of the Seals,
> Maître Kosisaka Kombe, Legal Adviser to the Presidency of the Republic,
> Mr. François Rigaux, Professor Emeritus at the Catholic University of Louvain,
> Ms Monique Chemillier-Gendreau, Professor at the University of Paris VII (Denis Diderot),
> Mr. Pierre d'Argent, Chargé de cours, Catholic University of Louvain,
> Mr. Moka N'Golo, Bâtonnier,
> Mr. Djeina Wembou, Professor at the University of Abidjan,
>
> as Counsel and Advocates;
>
> Mr. Mazyambo Makengo, Legal Adviser to the Ministry of Justice,
>
> as Counsellor,
>
> *and*

the Kingdom of Belgium,

represented by

> Mr. Jan Devadder, Director-General, Legal Matters, Ministry of Foreign Affairs,
>
> as Agent;
>
> Mr. Eric David, Professor of Public International Law, Université libre de Bruxelles,
> Mr. Daniel Bethlehem, Barrister, Bar of England and Wales, Fellow of Clare Hall and Deputy Director of the Lauterpacht Research Centre for International Law, University of Cambridge,
>
> as Counsel and Advocates;
>
> H.E. Baron Olivier Gillès de Pélichy, Permanent Representative of the Kingdom of Belgium to the Organization for the Prohibition of Chemical Weapons, responsible for relations with the International Court of Justice,
> Mr. Claude Debrulle, Director-General, Criminal Legislation and Human Rights, Ministry of Justice,
> Mr. Pierre Morlet, Advocate-General, Brussels Cour d'Appel,
> Mr. Wouter Detavernier, Deputy Counsellor, Directorate-General Legal Matters, Ministry of Foreign Affairs,
> Mr. Rodney Neufeld, Research Associate, Lauterpacht Research Centre for International Law, University of Cambridge,
> Mr. Tom Vanderhaeghe, Assistant at the Université libre de Bruxelles,

THE COURT,

composed as above,

after deliberation,

*delivers the following Judgment:*

6

1. On 17 October 2000 the Democratic Republic of the Congo (hereinafter referred to as "the Congo") filed in the Registry of the Court an Application instituting proceedings against the Kingdom of Belgium (hereinafter referred to as "Belgium") in respect of a dispute concerning an 'international arrest warrant issued on 11 April 2000 by a Belgian investigating judge . . . against the Minister for Foreign Affairs in office of the Democratic Republic of the Congo, Mr. Abdulaye Yerodia Ndombasi".

In that Application the Congo contended that Belgium had violated the "principle that a State may not exercise its authority on the territory of another State", the "principle of sovereign equality among all Members of the United Nations, as laid down in Article 2, paragraph 1, of the Charter of the United Nations", as well as "the diplomatic immunity of the Minister for Foreign Affairs of a sovereign State, as recognized by the jurisprudence of the Court and following from Article 41, paragraph 2, of the Vienna Convention of 18 April 1961 on Diplomatic Relations".

In order to found the Court's jurisdiction the Congo invoked in the aforementioned Application the fact that "Belgium ha[d] accepted the jurisdiction of the Court and, in so far as may be required, the [aforementioned] Application signifie[d] acceptance of that jurisdiction by the Democratic Republic of the Congo".

2. Pursuant to Article 40, paragraph 2, of the Statute, the Application was forthwith communicated to the Government of Belgium by the Registrar; and, in accordance with paragraph 3 of that Article, all States entitled to appear before the Court were notified of the Application.

3. Since the Court included upon the Bench no judge of the nationality of either of the Parties, each Party proceeded to exercise the right conferred by Article 31, paragraph 3, of the Statute to choose a judge *ad hoc* to sit in the case; the Congo chose Mr. Sayeman Bula-Bula, and Belgium Ms Christine Van den Wyngaert.

4. On 17 October 2000, the day on which the Application was filed, the Government of the Congo also filed in the Registry of the Court a request for the indication of a provisional measure based on Article 41 of the Statute of the Court. At the hearings on that request, Belgium, for its part, asked that the case be removed from the List.

By Order of 8 December 2000 the Court, on the one hand, rejected Belgium's request that the case be removed from the List and, on the other, held that the circumstances, as they then presented themselves to the Court, were not such as to require the exercise of its power under Article 41 of the Statute to indicate provisional measures. In the same Order, the Court also held that "it [was] desirable that the issues before the Court should be determined as soon as possible" and that "it [was] therefore appropriate to ensure that a decision on the Congo's Application be reached with all expedition"

5. By Order of 13 December 2000, the President of the Court, taking account of the agreement of the Parties as expressed at a meeting held with their Agents on 8 December 2000, fixed time-limits for the filing of a Memorial by the Congo and of a Counter-Memorial by Belgium, addressing both issues of jurisdiction and admissibility and the merits. By Orders of 14 March 2001 and 12 April 2001, these time-limits, taking account of the reasons given by the Congo and the agreement of the Parties, were successively extended. The Memorial of the Congo was filed on 16 May 2001 within the time-limit thus finally prescribed.

6. By Order of 27 June 2001, the Court, on the one hand, rejected a request

7

by Belgium for authorization, in derogation from the previous Orders of the President of the Court, to submit preliminary objections involving suspension of the proceedings on the merits and, on the other, extended the time-limit prescribed in the Order of 12 April 2001 for the filing by Belgium of a Counter-Memorial addressing both questions of jurisdiction and admissibility and the merits. The Counter-Memorial of Belgium was filed on 28 September 2001 within the time-limit thus extended.

7. Pursuant to Article 53, paragraph 2, of the Rules, the Court, after ascertaining the views of the Parties, decided that copies of the pleadings and documents annexed would be made available to the public at the opening of the oral proceedings.

8. Public hearings were held from 15 to 19 October 2001, at which the Court heard the oral arguments and replies of:

*For the Congo:* H.E. Mr. Jacques Masangu-a-Mwanza,
H.E. Mr. Ngele Masudi,
Maître Kosisaka Kombe,
Mr. François Rigaux,
Ms Monique Chemillier-Gendreau,
Mr. Pierre d'Argent.

*For Belgium:* Mr. Jan Devadder,
Mr. Daniel Bethlehem,
Mr. Eric David.

9. At the hearings, Members of the Court put questions to Belgium, to which replies were given orally or in writing, in accordance with Article 61, paragraph 4, of the Rules of Court. The Congo provided its written comments on the reply that was given in writing to one of these questions, pursuant to Article 72 of the Rules of Court.

\*

10. In its Application, the Congo formulated the decision requested in the following terms:

"The Court is requested to declare that the Kingdom of Belgium shall annul the international arrest warrant issued on 11 April 2000 by a Belgian investigating judge, Mr. Vandermeersch, of the Brussels Tribunal de première instance against the Minister for Foreign Affairs in office of the Democratic Republic of the Congo, Mr. Abdulaye Yerodia Ndombasi, seeking his provisional detention pending a request for extradition to Belgium for alleged crimes constituting 'serious violations of international humanitarian law', that warrant having been circulated by the judge to all States, including the Democratic Republic of the Congo, which received it on 12 July 2000."

11. In the course of the written proceedings, the following submissions were presented by the Parties:

*On behalf of the Government of the Congo,*

in the Memorial:

"In light of the facts and arguments set out above, the Government of the Democratic Republic of the Congo requests the Court to adjudge and declare that:

8

1. by issuing and internationally circulating the arrest warrant of 11 April 2000 against Mr. Abdulaye Yerodia Ndombasi, Belgium committed a violation in regard to the DRC of the rule of customary international law concerning the absolute inviolability and immunity from criminal process of incumbent foreign ministers;
2. a formal finding by the Court of the unlawfulness of that act constitutes an appropriate form of satisfaction, providing reparation for the consequent moral injury to the DRC;
3. the violation of international law underlying the issue and international circulation of the arrest warrant of 11 April 2000 precludes any State, including Belgium, from executing it;
4. Belgium shall be required to recall and cancel the arrest warrant of 11 April 2000 and to inform the foreign authorities to whom the warrant was circulated that, following the Court's Judgment, Belgium renounces its request for their co-operation in executing the unlawful warrant."

*On behalf of the Government of Belgium,*

in the Counter-Memorial:

"For the reasons stated in Part II of this Counter-Memorial, Belgium requests the Court, as a preliminary matter, to adjudge and declare that the Court lacks jurisdiction in this case and/or that the application by the Democratic Republic of the Congo against Belgium is inadmissible.

If, contrary to the preceding submission, the Court concludes that it does have jurisdiction in this case and that the application by the Democratic Republic of the Congo is admissible, Belgium requests the Court to reject the submissions of the Democratic Republic of the Congo on the merits of the case and to dismiss the application."

12. At the oral proceedings, the following submissions were presented by the Parties:

*On behalf of the Government of the Congo,*

"In light of the facts and arguments set out during the written and oral proceedings, the Government of the Democratic Republic of the Congo requests the Court to adjudge and declare that:
1. by issuing and internationally circulating the arrest warrant of 11 April 2000 against Mr. Abdulaye Yerodia Ndombasi, Belgium committed a violation in regard to the Democratic Republic of the Congo of the rule of customary international law concerning the absolute inviolability and immunity from criminal process of incumbent foreign ministers; in so doing, it violated the principle of sovereign equality among States;
2. a formal finding by the Court of the unlawfulness of that act constitutes an appropriate form of satisfaction, providing reparation for the consequent moral injury to the Democratic Republic of the Congo;

3. the violations of international law underlying the issue and international circulation of the arrest warrant of 11 April 2000 preclude any State, including Belgium, from executing it;
4. Belgium shall be required to recall and cancel the arrest warrant of 11 April 2000 and to inform the foreign authorities to whom the war-

rant was circulated that Belgium renounces its request for their co-operation in executing the unlawful warrant."

*On behalf of the Government of Belgium,*

"For the reasons stated in the Counter-Memorial of Belgium and in its oral submissions, Belgium requests the Court, as a preliminary matter, to adjudge and declare that the Court lacks jurisdiction in this case and/or that the Application by the Democratic Republic of the Congo against Belgium is inadmissible.

If, contrary to the submissions of Belgium with regard to the Court's jurisdiction and the admissibility of the Application, the Court concludes that it does have jurisdiction in this case and that the Application by the Democratic Republic of the Congo is admissible, Belgium requests the Court to reject the submissions of the Democratic Republic of the Congo on the merits of the case and to dismiss the Application."

\* \* \*

13. On 11 April 2000 an investigating judge of the Brussels *Tribunal de première instance* issued "an international arrest warrant *in absentia*" against Mr. Abdulaye Yerodia Ndombasi, charging him, as perpetrator or co-perpetrator, with offences constituting grave breaches of the Geneva Conventions of 1949 and of the Additional Protocols thereto, and with crimes against humanity.

At the time when the arrest warrant was issued Mr. Yerodia was the Minister for Foreign Affairs of the Congo.

14. The arrest warrant was transmitted to the Congo on 7 June 2000, being received by the Congolese authorities on 12 July 2000. According to Belgium, the warrant was at the same time transmitted to the International Criminal Police Organization (Interpol), an organization whose function is to enhance and facilitate cross-border criminal police co-operation worldwide; through the latter, it was circulated internationally.

15. In the arrest warrant, Mr. Yerodia is accused of having made various speeches inciting racial hatred during the month of August 1998. The crimes with which Mr. Yerodia was charged were punishable in Belgium under the Law of 16 June 1993 "concerning the Punishment of Grave Breaches of the International Geneva Conventions of 12 August 1949 and of Protocols I and II of 8 June 1977 Additional Thereto", as amended by the Law of 10 February 1999 "concerning the Punishment of Serious Violations of International Humanitarian Law" (hereinafter referred to as the "Belgian Law").

Article 7 of the Belgian Law provides that "The Belgian courts shall have jurisdiction in respect of the offences provided for in the present Law, wheresoever they may have been committed". In the present case, according to Belgium, the complaints that initiated the proceedings as a result of which the arrest warrant was issued emanated from 12 individuals all resident in Belgium, five of whom were of Belgian nationality. It is not contested by Belgium, however, that the alleged acts to which

the arrest warrant relates were committed outside Belgian territory, that Mr. Yerodia was not a Belgian national at the time of those acts, and that Mr. Yerodia was not in Belgian territory at the time that the arrest warrant was issued and circulated. That no Belgian nationals were victims of the violence that was said to have resulted from Mr. Yerodia's alleged offences was also uncontested.

Article 5, paragraph 3, of the Belgian Law further provides that "[i]mmunity attaching to the official capacity of a person shall not prevent the application of the present Law".

16.  At the hearings, Belgium further claimed that it offered "to entrust the case to the competent authorities [of the Congo] for enquiry and possible prosecution", and referred to a certain number of steps which it claimed to have taken in this regard from September 2000, that is, before the filing of the Application instituting proceedings. The Congo for its part stated the following: "We have scant information concerning the form [of these Belgian proposals]." It added that "these proposals . . . appear to have been made very belatedly, namely *after* an arrest warrant against Mr. Yerodia had been issued".

17.  On 17 October 2000, the Congo filed in the Registry an Application instituting the present proceedings (see paragraph 1 above), in which the Court was requested "to declare that the Kingdom of Belgium shall annul the international arrest warrant issued on 11 April 2000". The Congo relied in its Application on two separate legal grounds. First, it claimed that "[t]he *universal jurisdiction* that the Belgian State attributes to itself under Article 7 of the Law in question" constituted a

> "[v]iolation of the principle that a State may not exercise its authority on the territory of another State and of the principle of sovereign equality among all Members of the United Nations, as laid down in Article 2, paragraph 1, of the Charter of the United Nations".

Secondly, it claimed that "[t]he non-recognition, on the basis of Article 5 . . . of the Belgian Law, of the immunity of a Minister for Foreign Affairs in office" constituted a "[v]iolation of the diplomatic immunity of the Minister for Foreign Affairs of a sovereign State, as recognized by the jurisprudence of the Court and following from Article 41, paragraph 2, of the Vienna Convention of 18 April 1961 on Diplomatic Relations".

18.  On the same day that it filed its Application instituting proceedings, the Congo submitted a request to the Court for the indication of a provisional measure under Article 41 of the Statute of the Court. During the hearings devoted to consideration of that request, the Court was informed that in November 2000 a ministerial reshuffle had taken place in the Congo, following which Mr. Yerodia had ceased to hold office as Minister for Foreign Affairs and had been entrusted with the portfolio of Minister of Education. Belgium accordingly claimed that the Congo's Application had become moot and asked the Court, as has already been

11

recalled, to remove the case from the List. By Order of 8 December 2000, the Court rejected both Belgium's submissions to that effect and also the Congo's request for the indication of provisional measures (see paragraph 4 above).

19. From mid-April 2001, with the formation of a new Government in the Congo, Mr. Yerodia ceased to hold the post of Minister of Education. He no longer holds any ministerial office today.

20. On 12 September 2001, the Belgian National Central Bureau of Interpol requested the Interpol General Secretariat to issue a Red Notice in respect of Mr. Yerodia. Such notices concern individuals whose arrest is requested with a view to extradition. On 19 October 2001, at the public sittings held to hear the oral arguments of the Parties in the case, Belgium informed the Court that Interpol had responded on 27 September 2001 with a request for additional information, and that no Red Notice had yet been circulated.

21. Although the Application of the Congo originally advanced two separate legal grounds (see paragraph 17 above), the submissions of the Congo in its Memorial and the final submissions which it presented at the end of the oral proceedings refer only to a violation "in regard to the . . . Congo of the rule of customary international law concerning the absolute inviolability and immunity from criminal process of incumbent foreign ministers" (see paragraphs 11 and 12 above).

\* \* \*

22. In their written pleadings, and in oral argument, the Parties addressed issues of jurisdiction and admissibility as well as the merits (see paragraphs 5 and 6 above). In this connection, Belgium raised certain objections which the Court will begin by addressing.

\* \*

23. The first objection presented by Belgium reads as follows:

> "That, in the light of the fact that Mr. Yerodia Ndombasi is no longer either Minister for Foreign Affairs of the [Congo] or a minister occupying any other position in the . . . Government [of the Congo], there is no longer a 'legal dispute' between the Parties within the meaning of this term in the Optional Clause Declarations of the Parties and that the Court accordingly lacks jurisdiction in this case."

24. Belgium does not deny that such a legal dispute existed between the Parties at the time when the Congo filed its Application instituting proceedings, and that the Court was properly seised by that Application. However, it contends that the question is not whether a legal dispute

12

existed at that time, but whether a legal dispute exists at the present time. Belgium refers in this respect *inter alia* to the *Northern Cameroons* case, in which the Court found that it "may pronounce judgment only in connection with concrete cases where there exists at the time of the adjudication an actual controversy involving a conflict of legal interests between the parties" (*I.C.J. Reports 1963*, pp. 33-34), as well as to the *Nuclear Tests* cases *(Australia* v. *France)(New Zealand* v. *France)*, in which the Court stated the following: "The Court, as a court of law, is called upon to resolve existing disputes between States . . . The dispute brought before it must therefore continue to exist at the time when the Court makes its decision" (*I.C.J. Reports 1974*, pp. 270-271, para. 55; p. 476, para. 58). Belgium argues that the position of Mr. Yerodia as Minister for Foreign Affairs was central to the Congo's Application instituting proceedings, and emphasizes that there has now been a change of circumstances at the very heart of the case, in view of the fact that Mr. Yerodia was relieved of his position as Minister for Foreign Affairs in November 2000 and that, since 15 April 2001, he has occupied no position in the Government of the Congo (see paragraphs 18 and 19 above). According to Belgium, while there may still be a difference of opinion between the Parties on the scope and content of international law governing the immunities of a Minister for Foreign Affairs, that difference of opinion has now become a matter of abstract, rather than of practical, concern. The result, in Belgium's view, is that the case has become an attempt by the Congo to "[seek] an advisory opinion from the Court", and no longer a "concrete case" involving an "actual controversy" between the Parties, and that the Court accordingly lacks jurisdiction in the case.

25. The Congo rejects this objection of Belgium. It contends that there is indeed a legal dispute between the Parties, in that the Congo claims that the arrest warrant was issued in violation of the immunity of its Minister for Foreign Affairs, that that warrant was unlawful *ab initio*, and that this legal defect persists despite the subsequent changes in the position occupied by the individual concerned, while Belgium maintains that the issue and circulation of the arrest warrant were not contrary to international law. The Congo adds that the termination of Mr. Yerodia's official duties in no way operated to efface the wrongful act and the injury that flowed from it, for which the Congo continues to seek redress.

\*

26. The Court recalls that, according to its settled jurisprudence, its jurisdiction must be determined at the time that the act instituting proceedings was filed. Thus, if the Court has jurisdiction on the date the case is referred to it, it continues to do so regardless of subsequent events. Such events might lead to a finding that an application has subsequently

become moot and to a decision not to proceed to judgment on the merits, but they cannot deprive the Court of jurisdiction (see *Nottebohm, Preliminary Objection, Judgment, I.C.J. Reports 1953*, p. 122; *Right of Passage over Indian Territory, Preliminary Objections, Judgment, I.C.J. Reports 1957*, p. 142; *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United Kingdom), Preliminary Objections, Judgment, I.C.J. Reports 1998*, pp. 23-24, para. 38; and *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United States of America), Preliminary Objections, Judgment, I.C.J. Reports 1998*, p. 129, para. 37).

27. Article 36, paragraph 2, of the Statute of the Court provides:

"The States parties to the present Statute may at any time declare that they recognize as compulsory *ipso facto* and without special agreement, in relation to any other State accepting the same obligation, the jurisdiction of the Court in all legal disputes concerning:

*(a)* the interpretation of a treaty;
*(b)* any question of international law;
*(c)* the existence of any fact which, if established, would constitute a breach of an international obligation;
*(d)* the nature or extent of the reparation to be made for the breach of an international obligation."

On 17 October 2000, the date that the Congo's Application instituting these proceedings was filed, each of the Parties was bound by a declaration of acceptance of compulsory jurisdiction, filed in accordance with the above provision: Belgium by a declaration of 17 June 1958 and the Congo by a declaration of 8 February 1989. Those declarations contained no reservation applicable to the present case.

Moreover, it is not contested by the Parties that at the material time there was a legal dispute between them concerning the international lawfulness of the arrest warrant of 11 April 2000 and the consequences to be drawn if the warrant was unlawful. Such a dispute was clearly a legal dispute within the meaning of the Court's jurisprudence, namely "a disagreement on a point of law or fact, a conflict of legal views or of interests between two persons" in which "the claim of one party is positively opposed by the other" (*Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United Kingdom), Preliminary Objections, Judgment, I.C.J. Reports 1998*, p. 17, para. 22; and *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United States of America), Preliminary Objections, Judgment, I.C.J. Reports 1998*, pp. 122-123, para. 21).

28. The Court accordingly concludes that at the time that it was seised

14

of the case it had jurisdiction to deal with it, and that it still has such jurisdiction. Belgium's first objection must therefore be rejected.

\* \*

29. The second objection presented by Belgium is the following:

> "That in the light of the fact that Mr. Yerodia Ndombasi is no longer either Minister for Foreign Affairs of the [Congo] or a minister occupying any other position in the . . Government [of the Congo], the case is now without object and the Court should accordingly decline to proceed to judgment on the merits of the case."

30. Belgium also relies in support of this objection on the *Northern Cameroons* case, in which the Court considered that it would not be a proper discharge of its duties to proceed further in a case in which any judgment that the Court might pronounce would be "without object" (*I.C.J. Reports 1963*, p. 38), and on the *Nuclear Tests* cases, in which the Court saw "no reason to allow the continuance of proceedings which it knows are bound to be fruitless" (*I.C.J. Reports 1974*, p. 271, para. 58; p. 477, para. 61). Belgium maintains that the declarations requested by the Congo in its first and second submissions would clearly fall within the principles enunciated by the Court in those cases, since a judgment of the Court on the merits in this case could only be directed towards the clarification of the law in this area for the future, or be designed to reinforce the position of one or other Party. It relies in support of this argument on the fact that the Congo does not allege any material injury and is not seeking compensatory damages. It adds that the issue and transmission of the arrest warrant were not predicated on the ministerial status of the person concerned, that he is no longer a minister, and that the case is accordingly now devoid of object.

31. The Congo contests this argument of Belgium, and emphasizes that the aim of the Congo — to have the disputed arrest warrant annulled and to obtain redress for the moral injury suffered — remains unachieved at the point in time when the Court is called upon to decide the dispute. According to the Congo, in order for the case to have become devoid of object during the proceedings, the cause of the violation of the right would have had to disappear, and the redress sought would have to have been obtained.

\*

32. The Court has already affirmed on a number of occasions that events occurring subsequent to the filing of an application may render the application without object such that the Court is not called upon to give a decision thereon (see *Questions of Interpretation and Application of the 1971 Mont-*

15

real Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United Kingdom), Preliminary Objections, Judgment, I.C.J. Reports 1998, p. 26, para. 46; and Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United States of America), Preliminary Objections, Judgment, I.C.J. Reports 1998, p. 131, para. 45).

However, it considers that this is not such a case. The change which has occurred in the situation of Mr. Yerodia has not in fact put an end to the dispute between the Parties and has not deprived the Application of its object. The Congo argues that the arrest warrant issued by the Belgian judicial authorities against Mr. Yerodia was and remains unlawful. It asks the Court to hold that the warrant is unlawful, thus providing redress for the moral injury which the warrant allegedly caused to it. The Congo also continues to seek the cancellation of the warrant. For its part, Belgium contends that it did not act in violation of international law and it disputes the Congo's submissions. In the view of the Court, it follows from the foregoing that the Application of the Congo is not now without object and that accordingly the case is not moot. Belgium's second objection must accordingly be rejected.

* *

33. The third Belgian objection is put as follows:

"That the case as it now stands is materially different to that set out in the [Congo]'s Application instituting proceedings and that the Court accordingly lacks jurisdiction in the case and/or that the application is inadmissible."

34. According to Belgium, it would be contrary to legal security and the sound administration of justice for an applicant State to continue proceedings in circumstances in which the factual dimension on which the Application was based has changed fundamentally, since the respondent State would in those circumstances be uncertain, until the very last moment, of the substance of the claims against it. Belgium argues that the prejudice suffered by the respondent State in this situation is analogous to the situation in which an applicant State formulates new claims during the course of the proceedings. It refers to the jurisprudence of the Court holding inadmissible new claims formulated during the course of the proceedings which, had they been entertained, would have transformed the subject of the dispute originally brought before it under the terms of the Application (see Fisheries Jurisdiction (Spain v. Canada), Jurisdiction of the Court, Judgment, I.C.J. Reports 1998, pp. 447-448, para. 29). In the circumstances, Belgium contends that, if the Congo wishes to maintain its claims, it should be required to initiate proceedings afresh or, at the very least, apply to the Court for permission to amend its initial Application.

35. In response, the Congo denies that there has been a substantial amendment of the terms of its Application, and insists that it has presented no new claim, whether of substance or of form, that would have transformed the subject-matter of the dispute. The Congo maintains that it has done nothing through the various stages in the proceedings but "condense and refine" its claims, as do most States that appear before the Court, and that it is simply making use of the right of parties to amend their submissions until the end of the oral proceedings.

\*

36. The Court notes that, in accordance with settled jurisprudence, it "cannot, in principle, allow a dispute brought before it by application to be transformed by amendments in the submissions into another dispute which is different in character" (*Société commerciale de Belgique, Judgment, 1939, P.C.I.J., Series A/B, No. 78*, p. 173; cf. *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America), Jurisdiction and Admissibility, Judgment, I.C.J. Reports 1984*, p. 427, para. 80; see also *Certain Phosphate Lands in Nauru (Nauru v. Australia), Preliminary Objections, Judgment, I.C.J. Reports 1992*, pp. 264-267, in particular paras. 69 and 70). However, the Court considers that in the present case the facts underlying the Application have not changed in a way that produced such a transformation in the dispute brought before it. The question submitted to the Court for decision remains whether the issue and circulation of the arrest warrant by the Belgian judicial authorities against a person who was at that time the Minister for Foreign Affairs of the Congo were contrary to international law. The Congo's final submissions arise "directly out of the question which is the subject-matter of that Application" (*Fisheries Jurisdiction (Federal Republic of Germany v. Iceland), Merits, Judgment, I.C.J. Reports 1974*, p. 203, para. 72; see also *Temple of Preah Vihear, Merits, Judgment, I.C.J. Reports 1962*, p. 36).

In these circumstances, the Court considers that Belgium cannot validly maintain that the dispute brought before the Court was transformed in a way that affected its ability to prepare its defence, or that the requirements of the sound administration of justice were infringed. Belgium's third objection must accordingly be rejected.

\* \*

37. The fourth Belgian objection reads as follows:

"That, in the light of the new circumstances concerning Mr. Yerodia Ndombasi, the case has assumed the character of an action of diplomatic protection but one in which the individual being pro-

tected has failed to exhaust local remedies, and that the Court accordingly lacks jurisdiction in the case and/or that the application is inadmissible."

38. In this respect, Belgium accepts that, when the case was first instituted, the Congo had a direct legal interest in the matter, and was asserting a claim in its own name in respect of the alleged violation by Belgium of the immunity of the Congo's Foreign Minister. However, according to Belgium, the case was radically transformed after the Application was filed, namely on 15 April 2001, when Mr. Yerodia ceased to be a member of the Congolese Government. Belgium maintains that two of the requests made of the Court in the Congo's final submissions in practice now concern the legal effect of an arrest warrant issued against a private citizen of the Congo, and that these issues fall within the realm of an action of diplomatic protection. It adds that the individual concerned has not exhausted all available remedies under Belgian law a necessary condition before the Congo can espouse the cause of one of its nationals in international proceedings.

39. The Congo, on the other hand, denies that this is an action for diplomatic protection. It maintains that it is bringing these proceedings in the name of the Congolese State, on account of the violation of the immunity of its Minister for Foreign Affairs. The Congo further denies the availability of remedies under Belgian law. It points out in this regard that it is only when the Crown Prosecutor has become seised of the case file and makes submissions to the Chambre du conseil that the accused can defend himself before the Chambre and seek to have the charge dismissed.

\*

40. The Court notes that the Congo has never sought to invoke before it Mr. Yerodia's personal rights. It considers that, despite the change in professional situation of Mr. Yerodia, the character of the dispute submitted to the Court by means of the Application has not changed: the dispute still concerns the lawfulness of the arrest warrant issued on 11 April 2000 against a person who was at the time Minister for Foreign Affairs of the Congo, and the question whether the rights of the Congo have or have not been violated by that warrant. As the Congo is not acting in the context of protection of one of its nationals, Belgium cannot rely upon the rules relating to the exhaustion of local remedies.

In any event, the Court recalls that an objection based on non-exhaustion of local remedies relates to the admissibility of the application (see *Interhandel, Preliminary Objections, Judgment, I.C.J. Reports 1959*, p. 26; *Elettronica Sicula S.p.A. (ELSI), Judgment, I.C.J. Reports 1989*, p. 42, para. 49). Under settled jurisprudence, the critical date for determining the admissibility of an application is the date on which it is filed

(see *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya* v. *United Kingdom), Preliminary Objections, Judgment, I.C.J. Reports 1998*, pp. 25-26, paras. 43-44; and *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya* v. *United States of America), Preliminary Objections, Judgment, I.C.J. Reports 1998*, pp. 130-131, paras. 42-43). Belgium accepts that, on the date on which the Congo filed the Application instituting proceedings, the Congo had a direct legal interest in the matter, and was asserting a claim in its own name. Belgium's fourth objection must accordingly be rejected.

\*  \*

41. As a subsidiary argument, Belgium further contends that "[i]n the event that the Court decides that it does have jurisdiction in this case and that the application is admissible, . . . the *non ultra petita* rule operates to limit the jurisdiction of the Court to those issues that are the subject of the [Congo]'s final submissions". Belgium points out that, while the Congo initially advanced a twofold argument, based, on the one hand, on the Belgian judge's lack of jurisdiction, and, on the other, on the immunity from jurisdiction enjoyed by its Minister for Foreign Affairs, the Congo no longer claims in its final submissions that Belgium wrongly conferred on itself universal jurisdiction *in absentia*. According to Belgium, the Congo now confines itself to arguing that the arrest warrant of 11 April 2000 was unlawful because it violated the immunity from jurisdiction of its Minister for Foreign Affairs, and that the Court consequently cannot rule on the issue of universal jurisdiction in any decision it renders on the merits of the case.

42. The Congo, for its part, states that its interest in bringing these proceedings is to obtain a finding by the Court that it has been the victim of an internationally wrongful act, the question whether this case involves the "exercise of an excessive universal jurisdiction" being in this connection only a secondary consideration. The Congo asserts that any consideration by the Court of the issues of international law raised by universal jurisdiction would be undertaken not at the request of the Congo but, rather, by virtue of the defence strategy adopted by Belgium, which appears to maintain that the exercise of such jurisdiction can "represent a valid counterweight to the observance of immunities".

\*

43. The Court would recall the well-established principle that "it is the duty of the Court not only to reply to the questions as stated in the final submissions of the parties, but also to abstain from deciding points not included in those submissions" (*Asylum, Judgment, I.C.J. Reports 1950*,

p. 402). While the Court is thus not entitled to decide upon questions not asked of it, the *non ultra petita* rule nonetheless cannot preclude the Court from addressing certain legal points in its reasoning. Thus in the present case the Court may not rule, in the operative part of its Judgment, on the question whether the disputed arrest warrant, issued by the Belgian investigating judge in exercise of his purported universal jurisdiction, complied in that regard with the rules and principles of international law governing the jurisdiction of national courts. This does not mean, however, that the Court may not deal with certain aspects of that question in the reasoning of its Judgment, should it deem this necessary or desirable.

\*   \*

44. The Court concludes from the foregoing that it has jurisdiction to entertain the Congo's Application, that the Application is not without object and that accordingly the case is not moot and that the Application is admissible. Thus, the Court now turns to the merits of the case.

\*   \*   \*

45. As indicated above (see paragraphs 41 to 43 above), in its Application instituting these proceedings, the Congo originally challenged the legality of the arrest warrant of 11 April 2000 on two separate grounds: on the one hand, Belgium's claim to exercise a universal jurisdiction and, on the other, the alleged violation of the immunities of the Minister for Foreign Affairs of the Congo then in office. However, in its submissions in its Memorial, and in its final submissions at the close of the oral proceedings, the Congo invokes only the latter ground.

46. As a matter of logic, the second ground should be addressed only once there has been a determination in respect of the first, since it is only where a State has jurisdiction under international law in relation to a particular matter that there can be any question of immunities in regard to the exercise of that jurisdiction. However, in the present case, and in view of the final form of the Congo's submissions, the Court will address first the question whether, assuming that it had jurisdiction under international law to issue and circulate the arrest warrant of 11 April 2000, Belgium in so doing violated the immunities of the then Minister for Foreign Affairs of the Congo.

\*   \*

47. The Congo maintains that, during his or her term of office, a Minister for Foreign Affairs of a sovereign State is entitled to inviolability

and to immunity from criminal process being "absolute or complete", that is to say, they are subject to no exception. Accordingly, the Congo contends that no criminal prosecution may be brought against a Minister for Foreign Affairs in a foreign court as long as he or she remains in office, and that any finding of criminal responsibility by a domestic court in a foreign country, or any act of investigation undertaken with a view to bringing him or her to court, would contravene the principle of immunity from jurisdiction. According to the Congo, the basis of such criminal immunity is purely functional, and immunity is accorded under customary international law simply in order to enable the foreign State representative enjoying such immunity to perform his or her functions freely and without let or hindrance. The Congo adds that the immunity thus accorded to Ministers for Foreign Affairs when in office covers *all* their acts, including any committed before they took office, and that it is irrelevant whether the acts done whilst in office may be characterized or not as "official acts".

48. The Congo states further that it does not deny the existence of a principle of international criminal law, deriving from the decisions of the Nuremberg and Tokyo international military tribunals, that the accused's official capacity at the time of the acts cannot, before any court, whether domestic or international, constitute a "ground of exemption from his criminal responsibility or a ground for mitigation of sentence". The Congo then stresses that the fact that an immunity might bar prosecution before a specific court or over a specific period does not mean that the same prosecution cannot be brought, if appropriate, before another court which is not bound by that immunity, or at another time when the immunity need no longer be taken into account. It concludes that immunity does not mean impunity.

49. Belgium maintains for its part that, while Ministers for Foreign Affairs in office generally enjoy an immunity from jurisdiction before the courts of a foreign State, such immunity applies only to acts carried out in the course of their official functions, and cannot protect such persons in respect of private acts or when they are acting otherwise than in the performance of their official functions.

50. Belgium further states that, in the circumstances of the present case, Mr. Yerodia enjoyed no immunity at the time when he is alleged to have committed the acts of which he is accused, and that there is no evidence that he was then acting in any official capacity. It observes that the arrest warrant was issued against Mr. Yerodia personally.

*

51. The Court would observe at the outset that in international law it is firmly established that, as also diplomatic and consular agents, certain

holders of high-ranking office in a State, such as the Head of State, Head of Government and Minister for Foreign Affairs, enjoy immunities from jurisdiction in other States, both civil and criminal. For the purposes of the present case, it is only the immunity from criminal jurisdiction and the inviolability of an incumbent Minister for Foreign Affairs that fall for the Court to consider.

52. A certain number of treaty instruments were cited by the Parties in this regard. These included, first, the Vienna Convention on Diplomatic Relations of 18 April 1961, which states in its preamble that the purpose of diplomatic privileges and immunities is "to ensure the efficient performance of the functions of diplomatic missions as representing States". It provides in Article 32 that only the sending State may waive such immunity. On these points, the Vienna Convention on Diplomatic Relations, to which both the Congo and Belgium are parties, reflects customary international law. The same applies to the corresponding provisions of the Vienna Convention on Consular Relations of 24 April 1963, to which the Congo and Belgium are also parties.

The Congo and Belgium further cite the New York Convention on Special Missions of 8 December 1969, to which they are not, however, parties. They recall that under Article 21, paragraph 2, of that Convention:

> "The Head of the Government, the Minister for Foreign Affairs and other persons of high rank, when they take part in a special mission of the sending State, shall enjoy in the receiving State or in a third State, in addition to what is granted by the present Convention, the facilities, privileges and immunities accorded by international law."

These conventions provide useful guidance on certain aspects of the question of immunities. They do not, however, contain any provision specifically defining the immunities enjoyed by Ministers for Foreign Affairs. It is consequently on the basis of customary international law that the Court must decide the questions relating to the immunities of such Ministers raised in the present case.

53. In customary international law, the immunities accorded to Ministers for Foreign Affairs are not granted for their personal benefit, but to ensure the effective performance of their functions on behalf of their respective States. In order to determine the extent of these immunities, the Court must therefore first consider the nature of the functions exercised by a Minister for Foreign Affairs. He or she is in charge of his or her Government's diplomatic activities and generally acts as its representative in international negotiations and intergovernmental meetings. Ambassadors and other diplomatic agents carry out their duties under his or her authority. His or her acts may bind the State represented, and there is a presumption that a Minister for Foreign Affairs, simply by virtue of that office, has full powers to act on behalf of the State (see, for

example, Article 7, paragraph 2 *(a)*, of the 1969 Vienna Convention on the Law of Treaties). In the performance of these functions, he or she is frequently required to travel internationally, and thus must be in a position freely to do so whenever the need should arise. He or she must also be in constant communication with the Government, and with its diplomatic missions around the world, and be capable at any time of communicating with representatives of other States. The Court further observes that a Minister for Foreign Affairs, responsible for the conduct of his or her State's relations with all other States, occupies a position such that, like the Head of State or the Head of Government, he or she is recognized under international law as representative of the State solely by virtue of his or her office. He or she does not have to present letters of credence: to the contrary, it is generally the Minister who determines the authority to be conferred upon diplomatic agents and countersigns their letters of credence. Finally, it is to the Minister for Foreign Affairs that chargés d'affaires are accredited.


54. The Court accordingly concludes that the functions of a Minister for Foreign Affairs are such that, throughout the duration of his or her office, he or she when abroad enjoys full immunity from criminal jurisdiction and inviolability. That immunity and that inviolability protect the individual concerned against any act of authority of another State which would hinder him or her in the performance of his or her duties.

55. In this respect, no distinction can be drawn between acts performed by a Minister for Foreign Affairs in an "official" capacity, and those claimed to have been performed in a "private capacity", or, for that matter, between acts performed before the person concerned assumed office as Minister for Foreign Affairs and acts committed during the period of office. Thus, if a Minister for Foreign Affairs is arrested in another State on a criminal charge, he or she is clearly thereby prevented from exercising the functions of his or her office. The consequences of such impediment to the exercise of those official functions are equally serious, regardless of whether the Minister for Foreign Affairs was, at the time of arrest, present in the territory of the arresting State on an "official" visit or a "private" visit, regardless of whether the arrest relates to acts allegedly performed before the person became the Minister for Foreign Affairs or to acts performed while in office, and regardless of whether the arrest relates to alleged acts performed in an "official" capacity or a "private" capacity. Furthermore, even the mere risk that, by travelling to or transiting another State a Minister for Foreign Affairs might be exposing himself or herself to legal proceedings could deter the Minister from travelling internationally when required to do so for the purposes of the performance of his or her official functions.

\* \*

56. The Court will now address Belgium's argument that immunities accorded to incumbent Ministers for Foreign Affairs can in no case protect them where they are suspected of having committed war crimes or crimes against humanity. In support of this position, Belgium refers in its Counter-Memorial to various legal instruments creating international criminal tribunals, to examples from national legislation, and to the jurisprudence of national and international courts.

Belgium begins by pointing out that certain provisions of the instruments creating international criminal tribunals state expressly that the official capacity of a person shall not be a bar to the exercise by such tribunals of their jurisdiction.

Belgium also places emphasis on certain decisions of national courts, and in particular on the judgments rendered on 24 March 1999 by the House of Lords in the United Kingdom and on 13 March 2001 by the Court of Cassation in France in the *Pinochet* and *Qaddafi* cases respectively, in which it contends that an exception to the immunity rule was accepted in the case of serious crimes under international law. Thus, according to Belgium, the *Pinochet* decision recognizes an exception to the immunity rule when Lord Millett stated that "[i]nternational law cannot be supposed to have established a crime having the character of a *jus cogens* and at the same time to have provided an immunity which is co-extensive with the obligation it seeks to impose", or when Lord Phillips of Worth Matravers said that "no established rule of international law requires state immunity *ratione materiae* to be accorded in respect of prosecution for an international crime". As to the French Court of Cassation, Belgium contends that, in holding that, "under international law as it currently stands, the crime alleged [acts of terrorism], irrespective of its gravity, does not come within the exceptions to the principle of immunity from jurisdiction for incumbent foreign Heads of State", the Court explicitly recognized the existence of such exceptions.

57. The Congo, for its part, states that, under international law as it currently stands, there is no basis for asserting that there is any exception to the principle of absolute immunity from criminal process of an incumbent Minister for Foreign Affairs where he or she is accused of having committed crimes under international law.

In support of this contention, the Congo refers to State practice, giving particular consideration in this regard to the *Pinochet* and *Qaddafi* cases, and concluding that such practice does not correspond to that which Belgium claims but, on the contrary, confirms the absolute nature of the immunity from criminal process of Heads of State and Ministers for Foreign Affairs. Thus, in the *Pinochet* case, the Congo cites Lord Browne-Wilkinson's statement that "[t]his immunity enjoyed by a head of state in power and an ambassador in post is a complete immunity attached to the person of the head of state or ambassador and rendering him immune from all actions or prosecutions . . .". According to the Congo, the

French Court of Cassation adopted the same position in its *Qaddafi* judgment, in affirming that "international custom bars the prosecution of incumbent Heads of State, in the absence of any contrary international provision binding on the parties concerned, before the criminal courts of a foreign State".

As regards the instruments creating international criminal tribunals and the latter's jurisprudence, these, in the Congo's view, concern only those tribunals, and no inference can be drawn from them in regard to criminal proceedings before national courts against persons enjoying immunity under international law.

\*

58. The Court has carefully examined State practice, including national legislation and those few decisions of national higher courts, such as the House of Lords or the French Court of Cassation. It has been unable to deduce from this practice that there exists under customary international law any form of exception to the rule according immunity from criminal jurisdiction and inviolability to incumbent Ministers for Foreign Affairs, where they are suspected of having committed war crimes or crimes against humanity.

The Court has also examined the rules concerning the immunity or criminal responsibility of persons having an official capacity contained in the legal instruments creating international criminal tribunals, and which are specifically applicable to the latter (see Charter of the International Military Tribunal of Nuremberg, Art. 7; Charter of the International Military Tribunal of Tokyo, Art. 6; Statute of the International Criminal Tribunal for the former Yugoslavia, Art. 7, para. 2; Statute of the International Criminal Tribunal for Rwanda, Art. 6, para. 2; Statute of the International Criminal Court, Art. 27). It finds that these rules likewise do not enable it to conclude that any such an exception exists in customary international law in regard to national courts.

Finally, none of the decisions of the Nuremberg and Tokyo international military tribunals, or of the International Criminal Tribunal for the former Yugoslavia, cited by Belgium deal with the question of the immunities of incumbent Ministers for Foreign Affairs before national courts where they are accused of having committed war crimes or crimes against humanity. The Court accordingly notes that those decisions are in no way at variance with the findings it has reached above.

In view of the foregoing, the Court accordingly cannot accept Belgium's argument in this regard.

59. It should further be noted that the rules governing the jurisdiction of national courts must be carefully distinguished from those governing jurisdictional immunities: jurisdiction does not imply absence of immunity, while absence of immunity does not imply jurisdiction. Thus,

although various international conventions on the prevention and punishment of certain serious crimes impose on States obligations of prosecution or extradition, thereby requiring them to extend their criminal jurisdiction, such extension of jurisdiction in no way affects immunities under customary international law, including those of Ministers for Foreign Affairs. These remain opposable before the courts of a foreign State, even where those courts exercise such a jurisdiction under these conventions.

60. The Court emphasizes, however, that the *immunity* from jurisdiction enjoyed by incumbent Ministers for Foreign Affairs does not mean that they enjoy *impunity* in respect of any crimes they might have committed, irrespective of their gravity. Immunity from criminal jurisdiction and individual criminal responsibility are quite separate concepts. While jurisdictional immunity is procedural in nature, criminal responsibility is a question of substantive law. Jurisdictional immunity may well bar prosecution for a certain period or for certain offences; it cannot exonerate the person to whom it applies from all criminal responsibility.

61. Accordingly, the immunities enjoyed under international law by an incumbent or former Minister for Foreign Affairs do not represent a bar to criminal prosecution in certain circumstances.

First, such persons enjoy no criminal immunity under international law in their own countries, and may thus be tried by those countries' courts in accordance with the relevant rules of domestic law.

Secondly, they will cease to enjoy immunity from foreign jurisdiction if the State which they represent or have represented decides to waive that immunity.

Thirdly, after a person ceases to hold the office of Minister for Foreign Affairs, he or she will no longer enjoy all of the immunities accorded by international law in other States. Provided that it has jurisdiction under international law, a court of one State may try a former Minister for Foreign Affairs of another State in respect of acts committed prior or subsequent to his or her period of office, as well as in respect of acts committed during that period of office in a private capacity.

Fourthly, an incumbent or former Minister for Foreign Affairs may be subject to criminal proceedings before certain international criminal courts, where they have jurisdiction. Examples include the International Criminal Tribunal for the former Yugoslavia, and the International Criminal Tribunal for Rwanda, established pursuant to Security Council resolutions under Chapter VII of the United Nations Charter, and the future International Criminal Court created by the 1998 Rome Convention. The latter's Statute expressly provides, in Article 27, paragraph 2, that "[i]mmunities or special procedural rules which may attach to the

official capacity of a person, whether under national or international law, shall not bar the Court from exercising its jurisdiction over such a person".

* * *

62. Given the conclusions it has reached above concerning the nature and scope of the rules governing the immunity from criminal jurisdiction enjoyed by incumbent Ministers for Foreign Affairs, the Court must now consider whether in the present case the issue of the arrest warrant of 11 April 2000 and its international circulation violated those rules. The Court recalls in this regard that the Congo requests it, in its first final submission, to adjudge and declare that:

> "[B]y issuing and internationally circulating the arrest warrant of 11 April 2000 against Mr. Abdulaye Yerodia Ndombasi, Belgium committed a violation in regard to the Democratic Republic of the Congo of the rule of customary international law concerning the absolute inviolability and immunity from criminal process of incumbent foreign ministers; in so doing, it violated the principle of sovereign equality among States."

63. In support of this submission, the Congo maintains that the arrest warrant of 11 April 2000 as such represents a "coercive legal act" which violates the Congo's immunity and sovereign rights, inasmuch as it seeks to "subject to an organ of domestic criminal jurisdiction a member of a foreign government who is in principle beyond its reach" and is fully enforceable without special formality in Belgium.

The Congo considers that the mere issuance of the warrant thus constituted a coercive measure taken against the person of Mr. Yerodia, even if it was not executed.

64. As regards the international circulation of the said arrest warrant, this, in the Congo's view, not only involved further violations of the rules referred to above, but also aggravated the moral injury which it suffered as a result of the opprobrium "thus cast upon one of the most prominent members of its Government". The Congo further argues that such circulation was a fundamental infringement of its sovereign rights in that it significantly restricted the full and free exercise, by its Minister for Foreign Affairs, of the international negotiation and representation functions entrusted to him by the Congo's former President. In the Congo's view, Belgium "[thus] manifests an intention to have the individual concerned arrested at the place where he is to be found, with a view to procuring his extradition". The Congo emphasizes moreover that it is necessary to avoid any confusion between the arguments concerning the legal effect of the arrest warrant abroad and the question of any responsibility of the foreign authorities giving effect to it. It points out in this regard that no State has acted on the arrest warrant, and that accordingly

"no further consideration need be given to the specific responsibility which a State executing it might incur, or to the way in which that responsibility should be related" to that of the Belgian State. The Congo observes that, in such circumstances, "there [would be] a direct causal relationship between the arrest warrant issued in Belgium and any act of enforcement carried out elsewhere".

65. Belgium rejects the Congo's argument on the ground that "the character of the arrest warrant of 11 April 2000 is such that it has neither infringed the sovereignty of, nor created any obligation for, the [Congo]".

With regard to the legal effects under Belgian law of the arrest warrant of 11 April 2000, Belgium contends that the clear purpose of the warrant was to procure that, if found in Belgium, Mr. Yerodia would be detained by the relevant Belgian authorities with a view to his prosecution for war crimes and crimes against humanity. According to Belgium, the Belgian investigating judge did, however, draw an explicit distinction in the warrant between, on the one hand, immunity from jurisdiction and, on the other hand, immunity from enforcement as regards representatives of foreign States who visit Belgium on the basis of an official invitation, making it clear that such persons would be immune from enforcement of an arrest warrant in Belgium. Belgium further contends that, in its effect, the disputed arrest warrant is national in character, since it requires the arrest of Mr. Yerodia if he is found in Belgium but it does not have this effect outside Belgium.

66. In respect of the legal effects of the arrest warrant outside Belgium, Belgium maintains that the warrant does not create any obligation for the authorities of any other State to arrest Mr. Yerodia in the absence of some further step by Belgium completing or validating the arrest warrant (such as a request for the provisional detention of Mr. Yerodia), or the issuing of an arrest warrant by the appropriate authorities in the State concerned following a request to do so, or the issuing of an Interpol Red Notice. Accordingly, outside Belgium, while the purpose of the warrant was admittedly "to establish a legal basis for the arrest of Mr. Yerodia . . . and his subsequent extradition to Belgium", the warrant had no legal effect unless it was validated or completed by some prior act "requiring the arrest of Mr. Yerodia by the relevant authorities in a third State". Belgium further argues that "[i]f a State had executed the arrest warrant, it might infringe Mr. [Yerodia's] criminal immunity", but that "the Party directly responsible for that infringement would have been that State and not Belgium".

*

67. The Court will first recall that the "international arrest warrant in absentia", issued on 11 April 2000 by an investigating judge of the Brussels Tribunal de première instance, is directed against Mr. Yerodia,

stating that he is "currently Minister for Foreign Affairs of the Democratic Republic of the Congo, having his business address at the Ministry of Foreign Affairs in Kinshasa". The warrant states that Mr. Yerodia is charged with being "the perpetrator or co-perpetrator" of:

> "— Crimes under international law constituting grave breaches causing harm by act or omission to persons and property protected by the Conventions signed at Geneva on 12 August 1949 and by Additional Protocols I and II to those Conventions (Article 1, paragraph 3, of the Law of 16 June 1993, as amended by the Law of 10 February 1999 concerning the punishment of serious violations of international humanitarian law)
> — Crimes against humanity (Article 1, paragraph 2, of the Law of 16 June 1993, as amended by the Law of 10 February 1999 concerning the punishment of serious violations of international humanitarian law)."

The warrant refers to "various speeches inciting racial hatred" and to "particularly virulent remarks" allegedly made by Mr. Yerodia during "public addresses reported by the media" on 4 August and 27 August 1998. It adds:

> "These speeches allegedly had the effect of inciting the population to attack Tutsi residents of Kinshasa: there were dragnet searches, manhunts (the Tutsi enemy) and lynchings.

> The speeches inciting racial hatred thus are said to have resulted in several hundred deaths, the internment of Tutsis, summary executions, arbitrary arrests and unfair trials."

68. The warrant further states that "the position of Minister for Foreign Affairs currently held by the accused does not entail immunity from jurisdiction and enforcement". The investigating judge does, however, observe in the warrant that "the rule concerning the absence of immunity under humanitarian law would appear . . . to require some qualification in respect of immunity from enforcement" and explains as follows:

> "Pursuant to the general principle of fairness in judicial proceedings, immunity from enforcement must, in our view, be accorded to all State representatives welcomed as such onto the territory of Belgium (on 'official visits'). Welcoming such foreign dignitaries as official representatives of sovereign States involves not only relations between individuals but also relations between States. This implies that such welcome includes an undertaking by the host State and its various components to refrain from taking any coercive measures against its guest and the invitation cannot become a pretext for ensnaring the individual concerned in what would then have to be labelled a trap. In the contrary case, failure to respect this

undertaking could give rise to the host State's international responsibility."

69. The arrest warrant concludes with the following order:

"We instruct and order all bailiffs and agents of public authority who may be so required to execute this arrest warrant and to conduct the accused to the detention centre in Forest;

We order the warden of the prison to receive the accused and to keep him (her) in custody in the detention centre pursuant to this arrest warrant;

We require all those exercising public authority to whom this warrant shall be shown to lend all assistance in executing it."

70. The Court notes that the *issuance*, as such, of the disputed arrest warrant represents an act by the Belgian judicial authorities intended to enable the arrest on Belgian territory of an incumbent Minister for Foreign Affairs on charges of war crimes and crimes against humanity. The fact that the warrant is enforceable is clearly apparent from the order given to "all bailiffs and agents of public authority . . . to execute this arrest warrant" (see paragraph 69 above) and from the assertion in the warrant that "the position of Minister for Foreign Affairs currently held by the accused does not entail immunity from jurisdiction and enforcement". The Court notes that the warrant did admittedly make an exception for the case of an official visit by Mr. Yerodia to Belgium, and that Mr. Yerodia never suffered arrest in Belgium. The Court is bound, however, to find that, given the nature and purpose of the warrant, its mere issue violated the immunity which Mr. Yerodia enjoyed as the Congo's incumbent Minister for Foreign Affairs. The Court accordingly concludes that the issue of the warrant constituted a violation of an obligation of Belgium towards the Congo, in that it failed to respect the immunity of that Minister and, more particularly, infringed the immunity from criminal jurisdiction and the inviolability then enjoyed by him under international law.

71. The Court also notes that Belgium admits that the purpose of the international *circulation* of the disputed arrest warrant was "to establish a legal basis for the arrest of Mr. Yerodia . . . abroad and his subsequent extradition to Belgium". The Respondent maintains, however, that the enforcement of the warrant in third States was "dependent on some further preliminary steps having been taken" and that, given the "inchoate" quality of the warrant as regards third States, there was no "infringe[ment of] the sovereignty of the [Congo]". It further points out that no Interpol Red Notice was requested until 12 September 2001, when Mr. Yerodia no longer held ministerial office.

The Court cannot subscribe to this view. As in the case of the warrant's issue, its international circulation from June 2000 by the Belgian authorities, given its nature and purpose, effectively infringed Mr. Yero-

dia's immunity as the Congo's incumbent Minister for Foreign Affairs and was furthermore liable to affect the Congo's conduct of its international relations. Since Mr. Yerodia was called upon in that capacity to undertake travel in the performance of his duties, the mere international circulation of the warrant, even in the absence of "further steps" by Belgium, could have resulted, in particular, in his arrest while abroad. The Court observes in this respect that Belgium itself cites information to the effect that Mr. Yerodia, "on applying for a visa to go to two countries, [apparently] learned that he ran the risk of being arrested as a result of the arrest warrant issued against him by Belgium", adding that "[t]his, moreover, is what the [Congo] . . . hints when it writes that the arrest warrant 'sometimes forced Minister Yerodia to travel by roundabout routes'". Accordingly, the Court concludes that the circulation of the warrant, whether or not it significantly interfered with Mr. Yerodia's diplomatic activity, constituted a violation of an obligation of Belgium towards the Congo, in that it failed to respect the immunity of the incumbent Minister for Foreign Affairs of the Congo and, more particularly, infringed the immunity from criminal jurisdiction and the inviolability then enjoyed by him under international law.

* * *

72. The Court will now address the issue of the remedies sought by the Congo on account of Belgium's violation of the above-mentioned rules of international law. In its second, third and fourth submissions, the Congo requests the Court to adjudge and declare that:

> "A formal finding by the Court of the unlawfulness of [the issue and international circulation of the arrest warrant] constitutes an appropriate form of satisfaction, providing reparation for the consequent moral injury to the Democratic Republic of the Congo;
>
> The violations of international law underlying the issue and international circulation of the arrest warrant of 11 April 2000 preclude any State, including Belgium, from executing it;
> Belgium shall be required to recall and cancel the arrest warrant of 11 April 2000 and to inform the foreign authorities to whom the warrant was circulated that Belgium renounces its request for their co-operation in executing the unlawful warrant."

73. In support of those submissions, the Congo asserts that the termination of the official duties of Mr. Yerodia in no way operated to efface the wrongful act and the injury flowing from it, which continue to exist. It argues that the warrant is unlawful *ab initio*, that "[i]t is fundamentally flawed" and that it cannot therefore have any legal effect today. It points

out that the purpose of its request is reparation for the injury caused, requiring the restoration of the situation which would in all probability have existed if the said act had not been committed. It states that, inasmuch as the wrongful act consisted in an internal legal instrument, only the "withdrawal" and "cancellation" of the latter can provide appropriate reparation.

The Congo further emphasizes that in no way is it asking the Court itself to withdraw or cancel the warrant, nor to determine the means whereby Belgium is to comply with its decision. It explains that the withdrawal and cancellation of the warrant, by the means that Belgium deems most suitable, "are not means of enforcement of the judgment of the Court but the requested measure of legal reparation/restitution itself". The Congo maintains that the Court is consequently only being requested to declare that Belgium, by way of reparation for the injury to the rights of the Congo, be required to withdraw and cancel this warrant by the means of its choice.

74. Belgium for its part maintains that a finding by the Court that the immunity enjoyed by Mr. Yerodia as Minister for Foreign Affairs had been violated would in no way entail an obligation to cancel the arrest warrant. It points out that the arrest warrant is still operative and that "there is no suggestion that it presently infringes the immunity of the Congo's Minister for Foreign Affairs". Belgium considers that what the Congo is in reality asking of the Court in its third and fourth final submissions is that the Court should direct Belgium as to the method by which it should give effect to a judgment of the Court finding that the warrant had infringed the immunity of the Congo's Minister for Foreign Affairs.

\*

75. The Court has already concluded (see paragraphs 70 and 71) that the issue and circulation of the arrest warrant of 11 April 2000 by the Belgian authorities failed to respect the immunity of the incumbent Minister for Foreign Affairs of the Congo and, more particularly, infringed the immunity from criminal jurisdiction and the inviolability then enjoyed by Mr. Yerodia under international law. Those acts engaged Belgium's international responsibility. The Court considers that the findings so reached by it constitute a form of satisfaction which will make good the moral injury complained of by the Congo.

76. However, as the Permanent Court of International Justice stated in its Judgment of 13 September 1928 in the case concerning the *Factory at Chorzów*:

"[t]he essential principle contained in the actual notion of an illegal act — a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals — is that reparation must, as far as possible, wipe out all the conse-

32

quences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed" (*P.C.I.J., Series A, No. 17*, p. 47).

In the present case, "the situation which would, in all probability, have existed if [the illegal act] had not been committed" cannot be re-established merely by a finding by the Court that the arrest warrant was unlawful under international law. The warrant is still extant, and remains unlawful, notwithstanding the fact that Mr. Yerodia has ceased to be Minister for Foreign Affairs. The Court accordingly considers that Belgium must, by means of its own choosing, cancel the warrant in question and so inform the authorities to whom it was circulated.

77. The Court sees no need for any further remedy: in particular, the Court cannot, in a judgment ruling on a dispute between the Congo and Belgium, indicate what that judgment's implications might be for third States, and the Court cannot therefore accept the Congo's submissions on this point.

*  *  *

78. For these reasons,

THE COURT,

(1) (A) By fifteen votes to one,

*Rejects* the objections of the Kingdom of Belgium relating to jurisdiction, mootness and admissibility;

IN FAVOUR: *President* Guillaume; *Vice-President* Shi; *Judges* Ranjeva, Herczegh, Fleischhauer, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Buergenthal; *Judges* ad hoc Bula-Bula, Van den Wyngaert;

AGAINST: *Judge* Oda;

(B) By fifteen votes to one,

*Finds* that it has jurisdiction to entertain the Application filed by the Democratic Republic of the Congo on 17 October 2000;

IN FAVOUR: *President* Guillaume; *Vice-President* Shi *Judges* Ranjeva, Herczegh, Fleischhauer, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Buergenthal *Judges* ad hoc Bula-Bula, Van den Wyngaert;

AGAINST: *Judge* Oda;

(C) By fifteen votes to one,

*Finds* that the Application of the Democratic Republic of the Congo is not without object and that accordingly the case is not moot;

IN FAVOUR: *President* Guillaume; *Vice-President* Shi: *Judges* Ranjeva, Herczegh, Fleischhauer, Koroma, Vereshchetin, Higgins, Parra-Aranguren,

Kooijmans, Rezek, Al-Khasawneh, Buergenthal; *Judges* ad hoc Bula-Bula, Van den Wyngaert;

AGAINST: *Judge* Oda;

(D) By fifteen votes to one,

*Finds* that the Application of the Democratic Republic of the Congo is admissible;

IN FAVOUR: *President* Guillaume; *Vice-President* Shi; *Judges* Ranjeva, Herczegh, Fleischhauer, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Buergenthal; *Judges* ad hoc Bula-Bula, Van den Wyngaert;

AGAINST: *Judge* Oda;

(2) By thirteen votes to three,

*Finds* that the issue against Mr. Abdulaye Yerodia Ndombasi of the arrest warrant of 11 April 2000, and its international circulation, constituted violations of a legal obligation of the Kingdom of Belgium towards the Democratic Republic of the Congo, in that they failed to respect the immunity from criminal jurisdiction and the inviolability which the incumbent Minister for Foreign Affairs of the Democratic Republic of the Congo enjoyed under international law;

IN FAVOUR: *President* Guillaume; *Vice-President* Shi; *Judges* Ranjeva, Herczegh, Fleischhauer, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Buergenthal; *Judge* ad hoc Bula-Bula;

AGAINST: *Judges* Oda, Al-Khasawneh; *Judge* ad hoc Van den Wyngaert;

(3) By ten votes to six,

*Finds* that the Kingdom of Belgium must, by means of its own choosing, cancel the arrest warrant of 11 April 2000 and so inform the authorities to whom that warrant was circulated.

IN FAVOUR: *President* Guillaume; *Vice-President* Shi; *Judges* Ranjeva, Herczegh, Fleischhauer, Koroma, Vereshchetin, Parra-Aranguren, Rezek; *Judge* ad hoc Bula-Bula;

AGAINST: *Judges* Oda, Higgins, Kooijmans, Al-Khasawneh, Buergenthal; *Judge* ad hoc Van den Wyngaert.

Done in French and in English, the French text being authoritative, at the Peace Palace, The Hague, this fourteenth day of February, two thousand and two, in three copies, one of which will be placed in the archives of the Court and the others transmitted to the Government of the Demo-

cratic Republic of the Congo and the Government of the Kingdom of Belgium, respectively.

*(Signed)* Gilbert GUILLAUME,
President.

*(Signed)* Philippe COUVREUR,
Registrar.

President GUILLAUME appends a separate opinion to the Judgment of the Court; Judge ODA appends a dissenting opinion to the Judgment of the Court; Judge RANJEVA appends a declaration to the Judgment of the Court; Judge KOROMA appends a separate opinion to the Judgment of the Court; Judges HIGGINS, KOOIJMANS and BUERGENTHAL append a joint separate opinion to the Judgment of the Court; Judge REZEK appends a separate opinion to the Judgment of the Court; Judge AL-KHASAWNEH appends a dissenting opinion to the Judgment of the Court; Judge *ad hoc* BULA-BULA appends a separate opinion to the Judgment of the Court; Judge *ad hoc* VAN DEN WYNGAERT appends a dissenting opinion to the Judgment of the Court.

*(Initialled)* G.G.
*(Initialled)* Ph.C.

---